Thank you, Your Honor. My name is Peter Sessions. I represent the plaintiff and the appellant in this case, Suzanne Stone. And this is a case about whether a medical benefit plan is required to pay for medically necessary mental health treatment when that coverage is required by law, but is purportedly excluded by an out-of-state limitation benefit plan. And the answer to this question should be yes, the plan is required to cover such treatment. Are you referring now to federal or state law? Well, when you say required by law, we think that that's a good question. And because there are two laws that we think are applicable in this case, they're both parody laws. One is a federal parody law and the other one is the California parody law. We've really focused in our briefs mostly on the California parody law. We think both apply, but we focused on the California parody law because that case has already been interpreted by this court in the Harlech v. Blue Shield case. So we think it makes more sense to focus on that case because a lot of the work we believe has already been done by the court in that case. So hopefully that answers your question. Yes, thank you. Now, the person at the heart of this case is plaintiff's daughter, G.S. She's a minor at the time this case was filed, and that's why we're using her initials. She suffered from anorexia nervosa in 2014. She was diagnosed. She lost significant weight and was admitted to an intensive day treatment program at UCSD. However, her condition deteriorated. She was hospitalized on more than one occasion. She needed major gastric feeding. So, Mr. Sessions, I apologize for interrupting you. Sure. Oh, and it looks like we lost Mr. Martinez. His screen is dark. Let's see. There, he's back. You're back. Okay. So we're well aware of the facts, and I did not see, at least at the administrative level, that the defendants disputed whether G.S.'s treatment was medically necessary, whether the recommended treatment was medically necessary. So I think what we're really focused on is the federal and the California Parity Act and what the case law means, and that would be helpful if you focused your argument on that. Sure. I can do that because that really goes to the heart of this case, which is the application of the Parity Act. And the Parity Act, as I understand the defendant's argument and the district court's ruling, and I'm sure defense counsel will correct me if I'm misrepresenting their position, but my understanding of the argument is that the Parity Law requires insurers to treat patients with mental illnesses the same as they would treat people with physical illnesses. Okay. I agree with you. I'm with you so far. And so the defendant's argument, as I understand it, is, well, we have this out-of-state territorial exclusion, and we apply that equally to physical and mental illnesses, and therefore there is no violation of the Parity Act. And with all due respect to the district court and defendants, we believe that this really is a superficial reading of the Parity Act because the Parity Laws generally do, the California Parity Law in particular, generally does two things. One, it does what we just talked about. It does tell insurance companies and health care benefit plans that they have to treat people equally. But importantly, it also imposes substantive requirements. The Parity Law requires insurance companies to cover certain things, and defendants in the district court really focused on that first aspect but really gave short shrift to the second one. When you say cover certain things, does that mean provide coverage to the same extent as coverage is provided for physical ailments or something else? Well, the answer to that question is in Harlech. And this court in Harlech v. Blue Shield said that the California Mental Health Parity Law imposes a substantive requirement on insurance companies to provide medically necessary coverage for people with mental illness, and specifically people with anorexia. Wait a minute. Mr. Sessions, wait a minute. Harlech says something beyond that, maybe something a little different. The Parity Law would require the defendant and other insurers to provide equal coverage for mental and physical conditions. Harlech agrees with that and says that the insurer must cover all medically necessary treatments under the same terms and conditions as applied to other medical conditions. In other words, I don't think Harlech can be read to say that if something is a mental health treatment and it's medically necessary, the insurer must cover it no matter what. As soon as you decide it's medically necessary, it's covered regardless of the terms and conditions of the contract and what the insurer provides for physical health. When I read your brief, it was pretty broad, and I may have misunderstood your argument, but it seems to me your argument is if it's medically necessary, it doesn't matter what the contract says, what is provided for physical health treatment, it's covered as long as it's mental health. Is that how broadly you read Harlech and statutes? Well, what we're saying is that Harlech imposes this requirement that insurers offer this coverage. I'm sorry to interrupt you again. To be clear, Harlech is a little different because in that instance, the insurer was not going to provide residential treatment at all. Residential treatment is only provided for mental health treatment. That's an important point. I would be the first to agree that this case is not identical to Harlech. What our argument is is that in this case, we arrive at the same result as in Harlech, but by a different route. Let me explain what I mean by that. In Harlech, as you mentioned, there was a blanket exclusion for residential treatment. The policy says we don't cover residential treatment at all, and this policy is, of course, different. It does say that they will cover residential treatment, but what our argument is is effectively it doesn't. It doesn't provide the medically necessary coverage that GS needed. The plan provides promises that the insurance company will pay for medically necessary residential treatment. In this case, what GS needed, what her medical necessity was, was a residential treatment facility for an adolescent, because she was an adolescent, that was a secure facility that had the capability of doing nasogastric feeding. The reason those two things were medically necessary for her was because she had a history of self-harm, so the secure facility means that she didn't hurt herself. Mr. Sessions, Mr. Sessions. She needed that in the past. You're reading the. And, in fact, she did need it again. Mr. Sessions, hold on. Judge Wallace is trying to ask you a question. Can you hear me, Mr. Sessions? Can you hear me? Yes, I apologize. It seems to me you're reading Harlech and the California Act to provide an independent mandatory substantive coverage for certain mental health conditions separate and apart from any parity requirement. Is that right? Well, it's a little more nuanced than that, and then let me explain why. What we're saying is that, effectively, in this case, they are not providing medically necessary coverage for GS. And the reason why. Yeah, yeah, yeah, but they don't provide it for any physical ailments either, I was saying. I'm sorry? I say UnitedHealthcare does not provide such coverage for physical ailments either out of state. Well, I mean, that's an interesting question, right? What's the equivalent? Well, let me say interesting question. Isn't it pertinent to our case here? Well, I don't think so, because the question isn't really what the equivalent physical treatment was. The question is whether the defendants complied with Harlech and the Parity Act requirements for the purposes of residential treatment. But isn't the question, where is the disparity? Where is the disparity in the situation between a claimant who has a mental health issue and a claimant who has a physical health issue? Can you identify the disparity for us? Yes, I can. The disparity is that they don't provide residential treatment. But they do. Their contract says that they do. They just don't provide residential treatment in the exact form that your clients preferred. Does that mean that's not residential treatment? Yes. The plan certainly has a provision that says we'll provide residential treatment. And I'm glad that you raised that point about plaintiff's preference, because that's an important point that we've covered in our briefs. Defendants argue that the plan doesn't require them to cover a participant's what they call treatment modality of their choice. And the district court went along with this argument. The district court agreed and said that plans don't have to provide benefits of a quote of a particular type simply to satisfy the beneficiary's preferences. But let's take a closer look at this language. Defendants are talking about choice. And district court is talking about preferences. But this case isn't about what plaintiff preferred or what she chose. This case is about what was medically necessary. Okay, but there are residential treatment centers in California that treat anorexia nervosa. Your clients talk about touring one of them and finding it not to be adequate for various reasons. Are there others? In the entire state of California, there's no other residential treatment center? In that work in California, the record shows that plaintiff called up defendants and said, what's available for my daughter? And they said, we have one facility, the Center for Discovery, I believe it is. And that's where she visited. But going to an in-network provider, that's pretty standard in an HMO. Doesn't that apply equally to mental health conditions and other health conditions? So it doesn't seem to be a disparity that you have to be in-network when you have an HMO. Well, there's a disparity if none of the facilities or treatment options in-state are effective to treat someone's medically necessary condition. And that's our argument. Our argument isn't that defendants don't offer residential treatment facilities. Our argument is that they don't offer residential treatment facilities that address those needs. And that's really the way health insurance works. You know, everyone's medical needs are individualized. And if a health care plan or an insurance policy says, if you have this condition, we'll provide treatment for it, and the plaintiff comes forward and says, I have this condition and I need the treatment, the defendant can't say, oh, well, we don't like the kind of treatment that you received. You know, so our argument is... But does it have to be provided in precisely the way that the insured request? So in other words, one of the issues you had was that there were times when GS needed a nasogastric feeding tube, which isn't typically done, as I understand it, at residential treatment centers, but could be done on an outpatient basis at a hospital. So a combination of providers in the network, that's not good enough, in your view? That's an important point, and that's an important part of our argument, which is, no. You know, insurance companies don't always have to cover things in the specific way that a plaintiff wants. But if they're going to make that assertion, if they're going to disagree with the plaintiff about what kind of treatment it is they want, they have to register that objection when they deny the claim. This case would be very different if defendants had said, we're not paying for your claim because it's out of state, and also we think you don't need this nasogastric feeding, and we've talked to our doctors here, and we think you could have gotten an alternative kind of treatment that would have been just as efficient. If they had said those things, this case would be very different, but they never said those things. So they said, it's out of network, we don't cover it. What, then, did your clients say? Did your clients list, okay, well, here's the problem, we need the Mobsley treatment, we need a nasogastric tube, we need a secure facility that can't have a swimming pool. I mean, when did that occur in the discussions? That occurred in plaintiff's appeal. So the plaintiff wrote a letter to defendants saying, my daughter needs this kind of treatment. And at no point in response to that letter or at any other time did defendants disagree with that. So this isn't the case about what plaintiff heard or what she wanted. That issue had waived by defendants in our mind. The only issue was whether they can apply it as territorial. Because they've already conceded by not arguing about it that the treatment she needed was medically necessary. Okay, so we're at a minute ten. If you'd like to reserve the rest of your time. I'll do that. Thank you, Your Honor. Okay. And, Mr. Martinez, when you're ready, please unmute your computer so we can hear you and then go ahead. There you go. Thank you, Your Honor. Raul Martinez for Appellees. Let me begin with the last issue, which is this idea that you can re-engineer or reverse engineer the coverage claim. I wanted to point out that when the benefit claim was submitted, the only point they made was that the plaintiff wanted this Mosley treatment, this family-based type therapy. And then after she went to treatment in Colorado, she then said, well, the facilities in California didn't provide nasal gastric treatment and they had a swimming pool, whereas the plaintiff had a possible security risk. She was possibly suicidal. They didn't have a full-time psychiatrist. So it strikes us as a post hoc attempt to create a basis for coverage that was never presented to Rockdome in the first instance. Was it presented on the appeal? It was presented on the appeal. Arguably, you can present new issues and facts in an administrative appeal, and the health plan has to take that into account under 29 CFR 2560.5. It's cited in their reply. So, yes, you have to take it into account, but that goes to the weight that you give it. You don't have to treat it as dispositive necessarily if you have the health plan, but it was taken into account. But the bottom line for Rockdome was that you had a territorial limitation for coverage, and the issues in this case are whether the Parity Acts can overcome the territorial limitation. We don't see that they do. If you say that the Parity Act requires a health plan to provide services out of state or another country, for example, without limitation, then you're writing out of the plan. You're eliminating that entire territorial provision. Well, Mr. Martins, can I ask you a hypothetical? I don't usually delve into these, but it might be helpful for me to understand this. So if you had an insured who had some form of cancer and needed a very particular type of treatment, maybe it's a particular kind of radiation or surgery or chemotherapy or something in particular, but nobody in the territorial area offered that particular treatment. It was deemed to be medically necessary for this patient. Would there be coverage for that person with this physical health condition to go out of state and receive that treatment? First of all, most plans have an exclusion for experimental treatment, so that would be one line. But assuming all things being equal and you had some treatment not available in California, I think as you're suggesting it would be the hypothetical, I still think that that would be excluded because the entire framework of the HMO is to provide any kind of service you're looking for. That's not the purpose of an HMO or any health plan. There are limitations, and the territorial limitation is one of the huge ones because the HMO has contracts with network providers. They want you to go on network. They want you to go within California because this is an HMO regulated by California law. So going out of state, all of a sudden you're bringing in all the regulations of some other state that are never contemplated by either the plan itself, which is based in California, or the regulations of the Department of Health Services in California. So those departments' regulations control here. So the whole idea that you can go out of state just in general I think is wrong, but that's not to say that with proper negotiations and can't find the treatment in California, I guess it's possible, it's conceivable that you could get that treatment out of state, but that's not what we have here. We have a situation where the treatment that she was seeking was available. It just wasn't available in the format that she wanted. She wanted to have a residential facility with nasal gastric services, and those are provided, but they're provided in a hospital setting. And frankly, a hospital setting is more expensive than residential. So the plan was willing to go there. The plan is, look, if you need to go to the hospital for gastric feeding, then we'll do that and we'll pay for it, and then we'll put you back in the residential facility. It may not be the most efficient thing from the planner's standpoint, and it is more expensive for opt-in, but that's not what the plan is supposed to do. It's not supposed to provide services in an a la carte kind of method where you pick and choose what you want if you're the participant. And there's a distinction between what's medically necessary and what is medically appropriate under the plan. So in this case you have a situation where what she was seeking was totally appropriate under the terms of the plan and her condition. For example, she wanted a full-time psychiatrist, and Colorado provided one. But there's no reason that you couldn't have a residential setting in California with a psychiatrist that would come in every day on an as-needed basis. So that, again, is not an issue of medical necessity. It's a question of the appropriateness of the health care provided, and it was appropriate. And I also should mention that to the extent there's any issue here as to what was appropriate, that was a factual finding that the district court made. Under the clear error rule, you have to defer to that. So to the extent you imply any findings to that extent, then you defer to Judge Seaborg on that. So medical necessity is not really the huge issue here. Yes, I get the point. But I'm a little concerned about why we're in medical necessity at all. What does the record show was the basis of denial of the coverage? Wasn't it for a reason different than medical necessity? It was, but within the administrative appeal, within the handling of the claim, was the whole question of what is appropriate treatment. And that was considered. Well, I know you're considering, but that's not my question. I'm not sure it's before us. Why aren't the defendants foreclosed from arguing medical necessity? Because the denial was on a different basis. So I'm asking the question, on what basis did you deny? I'll grant you that we did not deny on the basis of lack of medical necessity. We denied on the basis of whether the treatment plan that she was asking for was appropriate, given the guidelines and the terms of the health plan. Those are two different things. And the Judge Seaborg based his decision on the assumption that these services were medically necessary. That was his assumption. I don't know if he made an implied finding that they were appropriate or not appropriate. That's all I'm suggesting is that there's a factual issue within all of this that's related to medical necessity but not exactly medical necessity. And beyond that, her plaintiff's burden was to show medical necessity. Now, whether the health plan denied it because it wasn't medically necessary, the fact is that when she went to district court, that's something that she had to demonstrate because that's a basic part of the plan. And the fact that the health plan focused on the territorial limitation does not necessarily exclude the possibility that she failed to prove in the district court that there was a medical necessity for all of these treatments, including the gastric, nasal gastric treatment, which she could have received at a hospital. So that's how we see it. And I should also mention that the network issue, health plans are limited in the networks that they can provide to their beneficiaries and participants. If you go to Colorado, you'd have to have a whole different contract with this ERC facility that they sought treatment in Colorado because, yes, Optum may have a contract with them in Colorado under Colorado law, but it doesn't have a contract with ERC that would affect the terms and conditions of the plaintiff's plan. So it's easy to say, well, you're on a network and you have a network facility in Colorado. Let's go out there. But there's other considerations. Admittedly, those aren't part of the record, but it is probably more expensive to do certain things in other states than it would be in California, and that affects the premiums that you charge for the health plan. So it's a regulatory issue is what I'm suggesting. It's going to be different in California, and that's why you have territorial limitations. On the other hand, if there is an emergency, the territorial limitation doesn't apply. So if she had a psychotic episode in Colorado when she was on vacation, that would be covered. So that is the nature of an HMO plan, and you have to accept that to begin with, and to try to convert an HMO plan into some kind of PPO or a card plan only increases the cost for everybody else and makes it unfair for other persons who participate in the plan. So unless the court has any questions, I would submit. All right. Thank you. And then, Mr. Sessions, I think you have just a little over a minute left if you want to use that for rebuttal. My apologies. I was muted there for a moment. I'll be very brief. Again, I would like to reiterate we had a lot of discussion there during the defense counsel's presentation about the medical necessity of the treatment that she has received. And I'd just like to reiterate that that's not an issue in this appeal. That's been discussed below. And the other thing that I'd like to mention is what we really have here is a conflict between what the contract says and what the law requires. The law requires them to provide medically necessary residential treatment, and that treatment simply wasn't available, as the record demonstrates. That treatment simply wasn't available in state network. So as a result, the plaintiff was entitled to go out of state. If there's a conflict between contractual provisions and the law, then the law also prevails. And so with that, I'll submit. All right. Thank you. Thank you both, counsel.  Thank you, Your Honor.
judges: Wallace, Tashima, Bade